**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**October 31, 2012**

# In the Court of Appeals of Georgia

A12A0905. FORUM GROUP AT MORAN LAKE NURSING AND
REHABILITATION CENTER, LLC et al. v. TERHUNE.

BARNES, Presiding Judge.

In her capacity as executrix and individually, Loretta Terhune sued the nursing home where her father lived before he died, contending that his death resulted from complications after he suffered an untreated broken hip, among other injuries. Terhune also sued George D. Houser, who owned the nursing home, and ten additional corporate entities owned and operated by Houser, asserting theories of joint enterprise, violation of federal and state statues and regulations, breach of contract, medical malpractice, and negligence per se, among other things. After the trial court struck Houser's answer for discovery violations and granted Terhune a default judgment as to liability, a jury awarded her $2,842,180.11 in compensatory

damages, which were trebled by operation of law due to Houser's intentional violation of the Fair Business Practices Act, and $35 million in punitive damages. Houser appeals, contending that the trial court erred in striking his answer, in failing to remove a juror, and in making various evidentiary rulings during the trial. For the reasons that follow, we find no error and affirm.

Terhune's 80-year-old father, Morris Ellison, became a long-term resident of Forum Group at Moran Lake Nursing and Rehabilitation Center, LLC, in September 2006. He was diagnosed with an untreated hip fracture in April 2012 and died in hospice care ten days later. Terhune sued Moran Lake and its owner, Houser, alleging that Ellison died as a result of long-term abuse and neglect, which was caused in part by Houser's systemic underfunding of the facility that led to substandard care. Terhune also sued ten other businesses Houser owned,[1] alleging that Houser had dissolved the Moran Lake and Mt. Berry nursing homes, transferred their assets to different corporate entities, and co-mingled all of his business and personal assets.

---

[1]In addition to Houser, Moran Lake, and Mt. Berry, the defendants included Forum Group at Wildwood Park Nursing and Rehabilitation Center, LLC; Moran Lake Convalescent Center, LLC; Moran Lake Convalescent Co. LLC; Forum Healthcare Group, Inc.; Forum Group Corp.; Forum Group Management Services, Inc.; Three Rivers Health Care Co.; The Nepenthe Group, Inc.; and The Property Co., Ltd., LP.

2

None of the defendants answered within thirty days of being served. Thirty-nine days after the last defendant was served and forty-eight days after the first, Houser, who is an attorney, filed an answer on behalf of "DEFENDANTS Forum Group at Moran Lake Nursing and Rehabilitation Center, LLC, Et. AL [sic]." He also paid costs of $107 at that time.

Terhune moved for default judgment on June 11, 2009 against all of the defendants. Under OCGA § 9-11-55 (a), a defendant may open a default as a matter of right within forty-five days of service by paying costs, but Terhune argued that Houser only paid costs to open the default against one defendant, not all twelve. Further, while the court may in its discretion allow a defendant to open a default before judgment is entered under certain grounds, Houser did not assert any of those grounds in his answer.[2]

Houser did not respond to the motion for default judgment, and Terhune filed a second motion for default judgment on July 28, 2009. Houser did not respond to that motion either. Following a hearing in August 2009, the trial court granted

[2]The three grounds for opening default before judgment is entered are providential cause, excusable neglect, and a "proper case," and the defendant must pay costs, make a showing under oath, offer to plead instanter, announce ready for trial, and present a meritorious defense. OCGA § 9-11-55 (b).

3

Terhune's motions for default judgment on September 2, 2009. The court found that, without a timely answer from any of the defendants, the complaint stood admitted, the allegations within it established the defendants' liability, and the case would proceed to trial on the issue of damages only.

Later in September 2009, Terhune moved the court to compel Houser to respond to the requests for production and interrogatories she had served on the defendants with the complaint five months earlier. While Houser did not respond to the motion to compel, on November 6, 2009, he filed a belated response to Terhune's already-granted motion for default judgment and a motion to set aside the default judgment under OCGA § 9-11-60.[3]

After a hearing, on November 11, 2009, the trial court granted Terhune's motion to compel and ordered Houser to respond to discovery within seven days. It further ordered that if Houser failed to comply, the court would impose sanctions and attorney fees against the defendants. The court did not rule on Houser's motion to open the default judgment. Two months later, in January 2010, Terhune moved for

_____

[3]"A motion to set aside may be brought to set aside a judgment based upon: (1) Lack of jurisdiction over the person or the subject matter; (2) Fraud, accident, or mistake or the acts of the adverse party unmixed with the negligence or fault of the movant; or (3) A nonamendable defect which appears upon the face of the record or pleadings." OCGA § 9-11-60 (d).

4

sanctions against Houser for his continued failure to respond to discovery. Houser did not respond to the motion for sanctions.

On April 30, 2010, the trial court granted Terhune's motion for sanctions and struck the defendants' answer, finding that Houser had "completely failed to respond to the Court's Order on Plaintiffs' Motion to Compel" entered more than five months earlier. The court further found that, regardless of whether Houser's motion to set aside the default judgment had merit, it was moot.

Terhune filed her portion of the pre-trial order and a motion in limine on August 27, 2010, and the four-day trial began on August 30, 2010. Before trial began, the court granted most of Terhune's motion in limine, excluding matters primarily related to liability, Before calling her first witness, Terhune read to the jury the facts set out in her complaint which were deemed admitted. During the trial, however, Houser repeatedly attempted to violate the trial court's rulings on Terhune's motion in limine, to the point that the trial court found him in contempt and ordered him arrested and held for 48 hours.

In the middle of the trial, Houser presented the court with a suggestion of bankruptcy involving himself, Moran Lake Convalescent Center, LLC, and Moran Lake Convalescent Company, LLC. The trial court stopped the proceedings for a day

5

until Terhune obtained an order from the bankruptcy court granting relief from the stay, and the trial continued to verdict.

Houser enumerates eight arguments on appeal, contending that the $43.3 million verdict is unsupportable because his facility gave Ellison "excellent care and [was] not responsible for his death." To the contrary, however, the admitted facts as pled in Terhune's lengthy complaint and further confirmed by evidence at trial establish that Ellison's "care" at Moran Lake was far from "excellent."

The evidence established that Ellison had health issues which placed him at risk for falls when he was admitted to Moran Lake in September 2006, but nursing home personnel failed to implement fall risk precautions. As a result, Ellison fell numerous times, suffering bruises and skin tears, until he was finally taken to the emergency room on April 7, 2007 and diagnosed with a badly broken hip of undetermined age and a severe systemic infection. He was admitted to the hospital for six days, then discharged to hospice care, where he was unresponsive except for crying out in pain when health care personnel shifted him. He died four days later.

Terhune and a close friend testified about Ellison's physical and mental state while he was at Moran Lake. Ellison was always hungry so his daughter would fill his drawer with snacks, but residents wandered in and out at will and took Ellison's

6

food. He was often thirsty but he never had water in his glass or water bucket. He would spit his medications out onto the wall by his bed, which also had fecal matter on it. His daughter cleaned the wall, but when she returned it was filthy again and, despite repeated requests, no one cleaned it. His bathroom never functioned, although residents kept using it, and his diaper was always soiled. His daughter tried to find another facility, but there were no beds available elsewhere.

Ellison's wheelchair had no footrests so his feet dragged along the floor. When his daughter asked staff for a solution, they told her to "look out back" for a better chair, but there was no better chair available. His bed rail was broken, and after he fell out of bed twice, the staff turned the bed around and pushed the broken side against the wall. He fell from his wheelchair and laid on the floor for 45 minutes with bruises and head trauma before being attended. He fell again several more times before he was taken to the emergency room shortly before he died.

The chief medical examiner for Cobb County testified about the results of the autopsy he performed on Ellison's body. Ellison had multiple bruises and bedsores, and his hip fracture had been untreated for some indeterminate amount of time. He was malnourished and dehydrated, his muscles had wasted away, and the soles of his feet were damaged from dragging on the ground. The medical examiner agreed with

the conclusion on Ellison's death certificate that he died from complications arising from the fractured hip. Many more gruesome details about the living conditions at Moran Lake in general and Ellison's circumstances in particular were introduced into evidence during the trial.

The evidence also established that problems at the nursing home were systemic. A ombudsman who worked at Georgia Legal Services during the time Houser owned the facility testified about the violations she observed, including sanitation problems with food preparation and laundry. A registered nurse who served as a nursing director at Moran Lake from 2003 to 2007 described the facility as being in "chaos," with the employees worried about having enough food to feed the residents or supplies for bathing them. In late 2006, the nurse testified, the chaos worsened. Employees were paid late, and the facility was understaffed. Employees bought soap, powder, medications, and vitamins for the residents out of their own pockets, while garbage piled up. At times the maintenance man had no funds to buy replacement light bulbs so the residents could see to use their bathrooms. Residents were wearing cloth diapers because they were less expensive than disposable ones, but the laundry facilities did not always work properly. At times the employees hauled the soiled laundry to a commercial laundromat, and the nursing home smelled strongly of urine

and feces. Local banks stopped honoring Moran Lake paychecks, so "money trucks" came to the facility for the employees to cash their checks. When the truck pulled up, all the staff left their patients and ran into the parking lot before the money ran out.

Shortly after Ellison died, the State gave Houser notice that it was going to revoke the facility's certificate to operate in 30 days because the violations of state and federal nursing home and health regulations put residents in immediate jeopardy. All the residents had to be relocated, some who had lived at Moran Lake for many years, and bed space was in such short supply that some of the residents had to be placed in Tennessee and Alabama, far from family and friends. Disrupting the residents' normal routine was very traumatic for them. The facility was closed in June 2008, along with Houser's other nursing homes.

Houser admitted on the stand that he bought two new Mercedes Benz automobiles in 2004, using money the federal government was paying to the nursing home for the residents' care. He also bought five pieces of real property in 2004 and 2005 with funds from this account, including one he gave to his ex-wife that cost $1.355 million. He explained that the government funds were repayment for money he had already spent on resident care. He also testified, "I didn't have any personal funds. I didn't have a personal checking account. I just used my company." Finally,

9

he explained that he had acted "like a kid in a candy store" when the government began paying the nursing home bills regularly in 2004 after an unspecified period of delay, and if the government had continued making payments as expected, he would have encountered no financial difficulties. Houser disputed that the nursing home was in terrible shape, contending that the constant inspections uncovered only minor issues and that his three nursing homes were closed by the state due to "an extreme mistake."

The jury returned a verdict of $800,000 for the value of Ellison's life, $16,636.70 medical expenses, $19,879.00 contract damages, $5,664.41 funeral expenses, $2 million pain and suffering, and $35 million punitive damages. The trial court trebled the compensatory damages by operation of law due to the defendants' violation of the Fair Business Practices Act, and entered judgment against Houser and the other defendants for $43,526,540.33, with interest at the rate of 6.25 percent as provided by law. After the trial court denied Houser's motion for new trial, he filed this appeal.

1. Houser contends that the trial court erred in refusing to allow him to "prove or disprove [his] relative degree of wrongdoing" to the jury regarding the punitive

10

damages issue, arguing that the defendants "worked hard to cure Mr. Ellison's many ills," but were unable to present evidence to the jury.

Houser neither identifies any specific rulings nor cites to the trial transcript, citing only to affidavits from his wife and an orthopedic specialist he allegedly submitted during the hearing on his motion for new trial. These affidavits do not appear in the appellate record, but even if they did, Houser did not call either of these witnesses to testify at trial. "This court cannot consider the factual assertions of the parties appearing in briefs when such evidence does not appear on the record. Moreover, parties cannot supplement the record merely by attaching matters to or reciting matters in their briefs." (Citations omitted.) *Leatherwood v. State*, 212 Ga. App. 342 (1) (a) (441 SE2d 813) (1994).

"As the appellant, [Houser] had the burden to affirmatively show error by the record." (Citation and punctuation omitted.) *Fisher v. One Stop Mortg.*, 258 Ga. App. 479, 480 (574 SE2d 605) (2002). Houser has failed to establish that the trial court excluded admissible evidence from his trial, and therefore we find no abuse of discretion in the court's evidentiary rulings related to punitive damages.

2. Houser asserts that the trial court erred in refusing to allow him to introduce Ellison's medical records in evidence, which he claims would have shown that Ellison was extremely ill before he came to Moran Lake, that he probably broke his hip before he got there, that the hip fracture "was neither new nor mortal," and that the defendants "provided appropriate medical care to each of Mr. Ellison's many problems." This evidence, Houser contends, "would have made a fundamental difference in the jury's understanding of . . . how conscientiously Defendants cared for [Ellison]."

Instead of citing to the excluded medical records to make his point, however, Houser cites again to his wife's affidavit, which is not in the record. He then argues that his failure to timely respond to discovery was accidental, and that even though he never answered any of Terhune's interrogatories, she obtained most of the information she sought during his 16 hours of deposition, attendance at hearings, and "well written briefs." Finally, Houser cites OCGA § 5-5-22, which provides that courts may grant new trials "when any material evidence may be illegally . . . withheld from the jury over the objection of the movant."

Again, it is the appellant's burden to establish error by citations to the record, which Houser has not done, nor are Ellison's medical records included in the

12

appellate record. Whether to admit evidence objected to on the ground of relevancy is "within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent a clear abuse of discretion." *Zaimis v. Sharis*, 275 Ga. 532, 534 (3) (570 SE2d 313) (2002).

3. While Houser argues that the trial court erred by admitting Ellison's initial admission assessment into evidence, he admits that he did not object when it was first introduced. "A defendant cannot acquiesce in a trial court's ruling below and then complain about that ruling on appeal." *Lummus v. State*, 274 Ga. App. 636, 637 (1) (618 SE2d 692) (2005). Accordingly, Houser has not established that the trial court erred in admitting this evidence.

4. Houser argues that he was denied his right to a thorough and sifting cross-examination, as set forth in OCGA § 24-9-64. That code section, however, applies to criminal cases, and the criminal cases the defendants cite for the proposition that the trial court cannot restrict a defendant's right to cross-examination are inapplicable in this civil case. On the other hand, while OCGA § 24-9-81 provides generally that either the plaintiff or the defendant may call an opposing party as a witness for "a thorough and sifting examination," in this case liability was not an issue. Thus, the trial court was entitled to limit the defendants' cross-examination as it related to

13

liability, and we review such evidentiary rulings only for abuse of discretion. Further, Houser again has not cited to the record to support his claim that the trial court improperly abridged his questioning. Accordingly, we find no error.

5. Houser argues that he was denied his right to submit a pre-trial order and that the court improperly enforced plaintiff's portion of the unsigned order. Contrary to his assertion, the entry of a pre-trial order is not mandatory unless requested by a party, OCGA § 9-11-16, and he has not argued that he requested the entry of a pre-trial order. Further, he has not argued specifically how he was harmed. As in Division 4, OCGA § 24-9-64 does not support Houser's argument, as that code section applies only to criminal trials.

6. Houser argues that the court improperly offered its own opinion regarding what had or had not been proven when it made certain evidentiary rulings, and that those rulings constitute grounds for a new trial under OCGA § 9-10-7. That code section provides, " [i]t is error for any judge, during the progress of any case, or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved." OCGA § 9-10-7. Again, however, Houser fails to cite to the record to support this claim, and given the vague parameters of his argument, this court cannot

determine exactly which rulings Houser objects to, much less determine the context within which the rulings were made.

7. Houser contends that the trial court erred in denying his request to remove a juror or grant a mistrial after Houser's wife recognized the juror as the relative of an unhappy terminated employee. After the jury had been deliberating for more than an hour and a half, Houser moved for a mistrial because, he said, his wife had just recognized the juror as a relative of a former employee with whom the Housers had experienced a "violent confrontation." The trial court noted that Houser did not ask the panel if any of the jurors knew him and denied the motion. Houser argues on appeal that, absent a "counter-showing that the juror was not biased," the trial court abused its discretion in failing to remove the juror or grant a mistrial. He also argues that the juror appeared hostile and exhibited "public animus" during the trial, but these factual assertions are not supported by the record.

While "[a] juror shall not act on his private knowledge respecting the facts, witnesses, or parties unless sworn and examined as a witness in the case," OCGA § 9-10-6, Houser has not established that the juror in this case acted on private knowledge. His argument contains only baseless factual assertions that are not

15

supported by the record; accordingly, we find no abuse of discretion in the trial court's denial of his motion for mistrial.

8. Finally, Houser contends that he was unable to make timely answers to interrogatories because the relevant information was unavailable. He also asserts that he cooperated with discovery by sitting for depositions, during which Terhune must have obtained the most important information she sought because she scheduled no follow-up depositions, and argues that his "cooperative conduct [in attending depositions] factually eliminated [his] non-response to the interrogatories." He further argues that his discovery failures are excused because he thought his opposing counsel's six-month continuance gave Houser six months to respond to discovery, but the trial court granted sanctions two months before opposing counsel's leave expired.

The record establishes that Houser did not even respond to the motion for sanctions, however, and thus did not make this argument to the trial court. "Issues which have not been ruled on by the trial court may not be raised on appeal." *Ga. Dept. of Natural Resources v. Coweta County*, 261 Ga. 484 (405 SE2d 470) (1991). We therefore find no error in this regard.

*Judgment affirmed. Adams and McFadden, JJ., concur.*